# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:21MJ___99___-1 |
| INFORMATION ASSOCIATED WITH FACEBOOK USER ID 751673474 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1112, 3261(a), 3267(1), and 3238 | Manslaughter Within Maritime and Territorial Jurisdiction of the United States while employed by the Armed Forces Outside of the United States. |

The application is based on these facts:

See attached affidavit incorporated by reference as if fully restated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____*)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/ Jordan Sampson_____
*Applicant's signature*

_____Jordan Sampson-Special Agent, FBI_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____March 16, 2021_____

*Judge's signature*

City and state: _____Winston-Salem, North Carolina_____     Joi Elizabeth Peake, U. S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 751673474 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 1:21 MJ 99<br><br>~~Filed Under Seal~~ <br> *QP 3/16/21* |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jordan C. Sampson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the Facebook username ari.taylor and Facebook user ID 751673474 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Federal Bureau of Investigation (the "FBI") and have been so employed since January 2015.  As such, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7).  During my employment as an FBI Special Agent, I have investigated violations of federal law, including homicides, kidnappings, robberies and crimes on government installations.  I have training and

experience in cellular phone analysis, interview and interrogation, and evidence recovery. I am currently assigned to the Washington Field Office, Northern Virginia Violent Crimes Task Force.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 1112, Manslaughter, has been committed by Ari Taylor, the person who uses the aforementioned Facebook ID. There is also probable cause to search the information described in Attachment A for evidence of this crime, as described in Attachment B.

### Pertinent Statutes

5. I present this affidavit in support of a search warrant related to allegations against Ari Taylor ("Taylor") for a violation of Title 18, United States Code, Section 1112. Title 18, United States Code, Section 1112, Manslaughter, provides:

> (a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
>
> Voluntary—Upon a sudden quarrel or heat of passion.
>
> Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.
>
> (b) Within the special maritime and territorial jurisdiction of the United States, whoever is guilty of voluntary manslaughter, shall

2

be fined under this title or imprisoned not more than 15 years, or both;

Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

Title 18 United States Code, Section 3261(a) provides:

(a)Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States—

(1) while employed by or accompanying the Armed Forces outside the United States; . . .

shall be punished as provided for that offense.

Title 18 United States Code, Section 3267(1) provides:

The term "employed by the Armed Forces Outside of the United States" means –

(A)  Employed as -- . . .

(iii)  an employee of a contractor (or subcontractor at any tier) of –

(I)  the Department of Defense . . . or

(II)  any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas;

(B)  Present or residing outside of the United States in connection with such employment; and

(C)  Not a national of or ordinary resident in the host nation.

Title 18 United States Code, Section 3238 provides:

The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an

3

indictment or information may be filed in the district of the
last known residence of the offender or of any one of two
or more joint offenders, or if no such residence is known
the indictment or information may be filed in the District of
Columbia.

## Jurisdiction and Venue

6.     Taylor is a U.S. Citizen who was hired by a general military contractor to provide

support services, including moving pallets with a forklift, at Al Dhafra AB ("ADAB"), United

Arab Emirates ("UAE").  At the time of the offense, Taylor was an employee of the general

military contractor, that was providing services under a contract with the U.S. Air Force.  Taylor

arrived at ADAB on August 21, 2020, and he remained there until December 13, 2020.  At the

time of the offense on November 27, 2020, Taylor was at ADAB and outside of the United

States because of his employment with the general military contractor.  Taylor is neither a

national of nor an ordinary resident of the UAE.  Manslaughter is punishable by imprisonment

for more than one year.  Accordingly, the United States has jurisdiction to prosecute Taylor's

crimes pursuant to the Military Extraterritorial Jurisdiction Act (MEJA), 18 United States Code,

Sections 3261 *et seq*.

7.     Taylor maintains a residence in Semora, North Carolina, within the Middle

District of North Carolina, where he currently resides.  As Taylor's last known residence is in

Semora, North Carolina, venue for this crime lies in the Middle District of North Carolina.

## PROBABLE CAUSE

## Factual Basis Supporting Probable Cause

8.     On November 27, 2020 at approximately 9:30am, a vehicle incident occurred on

ADAB, adjacent to Building 4502, 380th Expeditionary Medical Group (EMDG), resulting in a

4

fatality. The EMDG is the base medical clinic. Special Agents (SA) Jarvis Beauchamp and Carl

Pella, Air Force Office of Special Investigations (OSI) arrived on scene and made contact with

Master Sergeant C.H., who advised that a forklift hit and killed a female, later identified as

Captain Kelliann Leli (Captain Leli), an active duty Air Force doctor. The operator of the

forklift was identified as Ari Taylor.

9.    Records reveal that a 911 call was placed to emergency services at 09:36:19 local

time. As depicted below, the area where the incident occurred is located directly adjacent to a

set of buildings. The weather conditions at the time of the incident were clear skies. The

incident occurred in a large open area on a gravel base that is shared between pedestrians and

vehicle traffic. The speed limit 20k/h (12 mph).



10.     It is believed that Captain Leli was on her way to the medical building when she was killed.  According to witness interviews, a person identified as Ari Taylor entered the medical building screaming that he had just killed someone and seeking help from medical personnel.  Almost immediately medical personnel exited the building and observed Captain Leli's body.  According to Taylor's supervisor, at approximately 9:38am, Taylor sent a Facebook message stating "I just killed someone."

11.     On November 27, 2020, SA Pella conducted a non-custodial interview of Taylor. During the interview Taylor stated that he awoke at 6am to begin his duty day.  Taylor admitted that at approximately 9:20am he had a text message conversation with his wife as he sat on the forklift.  Taylor then began driving towards the water storage area, behind Bldg. 3332, which brought him near the EMDG.  Taylor also mentioned that in addition to exchanging text messages, he also had one ear bud in his ear listening to music.

12.     Taylor was traveling southbound when he says he heard a "dog squeal" as he was driving over a bump on the back half of his forklift.  Taylor continued driving to "get off the bump" and further explained he could not see under the forklift while sitting on it.  Taylor explained he did not see Captain Leli in front of him before the incident.  Taylor estimated he was driving approximately 10-12 kilometers per hour (kph) at the time of the incident.  Taylor exited the forklift, observed the body of Captain Leli on the ground and proceeded to the EMDG. Once inside the EMDG, Taylor stated "I just killed someone" several times.

13.     During the interview, Taylor showed SA Pella the Facebook message he sent to his supervisor, where Taylor wrote "I just killed someone."  Taylor also showed SA Pella a Facebook Messenger thread between Taylor and another user who Taylor identified as his wife. This Facebook thread appeared to have been exchanged just prior to the incident.  Taylor

6

declined to provide his phone to SA Pella for further review. Based on my review of publicly available information Taylor's Facebook account has the username "ari.taylor" and Facebook ID 751673474.

14.     I have also learned that Taylor did not maintain a permit that authorized him to operate this type of forklift. A review of Taylor's training and certifications on file with his employer revealed that Taylor's last certification for this type of forklift expired in 2014. Taylor had a valid noncommercial driver license issued from North Carolina and a valid light vehicle license issued by the United Arab Emirates, but had no permit for the forklift involved in the incident. I have also learned that pursuant to traffic regulation in effect at the time of the incident, Captain Leli, as a pedestrian, had the right-of-way. The base traffic regulation (AEWI 31-218) specifically stated operators will yield to all pedestrian traffic crossing a roadway.

15.     Witnesses interviewed during the investigation recounted that the night before the incident Taylor was drinking alcohol and socializing with friends at the "Thirsty Camel," a bar opened to people working and serving at ADAB. Typically, according to base regulations, patrons at the "Thirsty Camel" are permitted up to three alcoholic drinks per day. Because November 26 was the Thanksgiving holiday, base regulations allowed patrons to have up to four alcoholic drinks. Witnesses who socialized regularly with Taylor explained that he regularly drank alcohol at the "Thirsty Camel" and often drank his maximum allotment of three alcoholic drinks. Staff from "the Thirsty Camel" explained that Taylor was a regular customer. Records from the "Thirsty Camel" show that Taylor purchased between 1-3 alcoholic drinks every night during the month of November 2020, except for November 8 through 12 and November 30. Records from "the Thirsty Camel" also show that Taylor purchased four alcoholic drinks between 9:25pm and 11:45pm on November 26, 2020, the night before the incident that resulted

7

in death of Captain Leli.  The last drink was purchased at 11:41pm, approximately six and a half hours before he awoke to start his next duty day.

16.     Based on my training and experience, I know that reading and drafting text messages while operating a vehicle may distract the operator and lead to a collision with another vehicle, object, or pedestrian.  I also know based on my training and experience that listening to music, while at the same time reading or drafting text messages, may exacerbate an already distracted operator.  I further know based on my training and experience that a combination of alcohol, a lack of a full night's rest, coupled with these other factors further impacts an operator's ability to safely navigate a motor vehicle such as a forklift indicating that Taylor may have acted without due caution and circumspection resulting in the death of Captain Leli.

17.     I assess that the information from Facebook may reveal the pattern, routine, and frequency of Taylor's Facebook usage, which may indicate Taylor's frequent use of Facebook while operating the forklift while working at ADAB.

18.     Similarly, I further assess the date requested may reveal important information concerning Taylor's communications relevant to the investigation. For example, Taylor admits that shortly after the incident he used Facebook, not another communication platform, to report to his supervisor that he may have killed someone.  This tells me that Taylor uses Facebook as one of his primary means of communication, including to communicate about important matters, such as the death of Captain Leli.

### Facebook

19.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news,

8

photographs, videos, and other information with other Facebook users, and sometimes with the general public.

20.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

21.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

22.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

9

23.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

24.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

25.    Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account which also records the

10

time of the communication. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date and time of each call.

26.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

28.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

31.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

11

32.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and

12

tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

35.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

36.    Based on the information developed thus far, including Taylor's admission that he used the Facebook text feature to communicate with his spouse just prior to the incident, and to

13

communicate with his supervisor just after the incident, I believe that Taylor routinely uses Facebook to communicate with others, and to document and share events in his life. Among other things, I believe that records from Facebook will establish the time during which Taylor communicated with his wife in the moments leading up to the death of Captain Leli, as well, as offer evidence of his activities the night before the incident, including his consumption of alcohol and the time of his last activity the night before. I also believe that Taylor's Facebook account maintains records that would establish the frequency of his Facebook activity to show a pattern of how he uses and accesses Facebook while operating a forklift. I also believe that Taylor's Facebook account maintains records that show the time of day that he uses or accesses Facebook. This information may produce evidence that indicates how much rest and sleep Taylor receives compared to when he operates a forklift. I believe that all of these factors are relevant to whether Taylor acted without due caution and circumspection that resulted in the death of Captain Leli.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

37.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

38.    Based on the foregoing, in particular Taylor's admission to using Facebook to communicate with others just prior to the crime and later communicate with others about the

14

crime, there is probable cause to believe that Taylor's Facebook records contain information related to the timing and content of his communications while driving the forklift; representations about the crime made to others after the crime; as well as other possible evidence, such as whether he or others discussed his consumption of alcohol the night before the incident, the time and frequency of Taylor's use of Facebook compared to the time of day he works while operating a forklift, his use of Facebook that would interfere with the amount of sleep prior to operating the forklift. All of these matters bear directly upon the issue of whether Taylor acted without due caution and circumspection at the time he killed Captain Leli.

39. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

40. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

41. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

/s/ Jordan Sampson
Jordan C. Sampson
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this _16_ day of March, 2021, at _4:02_ a.m./p.m.

Honorable Joi Elizabeth Peake
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook username ari.taylor and Facebook user ID 751673474 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

This warrant is associated with Facebook case number 5571459.

# ATTACHMENT B

## Particular Things to be Seized

### I.  Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the period November 22, 2020 to November 28, 2020:

(a)  Records and information revealing or referencing all contact and personal identifying information, including for user ID 751673474: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from November 22, 2020 to November 28, 2020;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from November 22, 2020 to November 28, 2020, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications, from November 22, 2020 to November 28, 2020;

(e)      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string, from November 22, 2020 to November 28, 2020;

(f)      All other records and contents of communications and messages made or received by the user from November 22, 2020 to November 28, 2020, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)      All "check ins" and other location information from November 22, 2020 to November 28, 2020;

(h)      All IP logs, including all records of the IP addresses that logged into the account from November 22, 2020 to November 28, 2020;

(i)      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked" from November 22, 2020 to November 28, 2020;

(j)      All information about the Facebook pages that the account is or was a "fan" of from November 22, 2020 to November 28, 2020;

2

(k)     All past and present lists of friends created by the account from November 22, 2020 to November 28, 2020;

(l)     All records of Facebook searches performed by the account from November 22, 2020 to November 28, 2020;

(m)     All information about the user's access and use of Facebook Marketplace from November 22, 2020 to November 28, 2020;

(n)     The types of service utilized by the user from November 22, 2020 to November 28, 2020;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number) from November 22, 2020 to November 28, 2020;

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account from November 22, 2020 to November 28, 2020;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken from November 22, 2020 to November 28, 2020.

Facebook is hereby ordered to disclose the above information to the government within 14 Days of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. 1112, Manslaughter, involving Ari Taylor from November 22, 2020 to November 28, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Any communications made prior to, during, or following the event from 9:00 am local time to 10:00 am local time on November 27, 2020; any statements or communications made about: the death of Captain Leli or the investigation of Captain Leli's death, the operation of a vehicle (including a forklift), Mr. Taylor's employment, traffic and safety regulations at ADAB, and drinking alcohol or otherwise becoming under the influence of intoxicating substances, from November 22, 2020 to November 28, 2020.

(b) Evidence indicating how, when, and for how long, the Facebook account was accessed or used, including the IP address associated the use, and all "check ins" and other location information from November 22, 2020 to November 28, 2020, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) All other records and contents of communications and messages made or received by the user from 9:00 am local time to 10:00 am local time on November 27, 2020, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests showing the frequency of these activities by the user;

4

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e) All records of Facebook searches performed by the account from November 22, 2020 to November 28, 2020, related to the death of Captain Leli or the investigation of Captain Leli's death, the operation of a vehicle (including a forklift), Mr. Taylor's employment, traffic and safety regulations at ADAB, and drinking alcohol or otherwise becoming under the influence of intoxicating substances;

(f) Records and information revealing or referencing all contact and personal identifying information, including for user ID 751673474: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the

5

disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.        all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.        such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.        the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.        the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

7

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                          Signature

8